UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TOUSAUN STEWART, | No. 2:11-cv-2348 JAM AC P |
| Petitioner, | |
| v. | FINDINGS & RECOMMENDATIONS |
| RALPH M. DIAZ, | |
| Respondent. | |

Petitioner is a state prisoner who filed an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging his 2008 convictions for first degree murder and three counts of attempted murder (ECF No. 1). Petitioner's counsel filed the § 2254 petition on September 6, 2011, which is the operative pleading pending before the court. ECF No. 1. Respondent has answered, ECF No. 14, and petitioner has filed a traverse, ECF No. 26.

For the reasons that follow, the undersigned recommends that the petition be denied on the merits without an evidentiary hearing.

I.     *LEGAL AND FACTUAL BACKGROUND*

A jury convicted petitioner of first degree murder and three counts of attempted murder based on a shooting incident at the Meadow Glen apartment complex. The jury further found that the shootings were committed for the benefit of a criminal street gang and imposed additional sentencing enhancements for the use of a firearm. Petitioner is serving a total sentence of 75 years to life plus an additional determinate term of 19 years.

1

   A. *The Beehive.*

   The prosecution presented the following evidence at trial.  The Meadow Glen apartment complex in Sacramento was located in an area controlled by the Bloods gang.  I R.T. 134, II R.T. 488.[1]  This apartment complex was described by numerous witnesses as a "beehive" of gang members who used the word "blood" frequently and identified themselves by wearing the color red.  II R.T. 491, 494.  The primary rival of the Bloods gang is the Crips, who use the word "cuz" and wear the color blue.  II R.T. 490, 494.  "It is a show of disrespect for a Crip to say 'cuz' to a Blood, and most of the time something is 'going to go down' if that happens."  ECF No. 14, Attachment 1, at 3 (California Court of Appeal Opinion).

   Petitioner, a documented Bloods gang member, stayed at the apartment complex with his aunt.  I R.T. 39, 133, II R.T. 579.  Sione Lomano also lived at this same apartment complex with his girlfriend, Taisa Basped and her four children.  I R.T. 29.  Basped's nephew, Cameron Boatmen, and godson, Jesse Woods-Reese, frequently visited the apartment complex even though they were both members of the Crips gang.  I R.T. 30, 133-34.  Mr. Lomano, who was also a member of the Crips gang, would frequently hang out with Mr. Boatmen, Mr. Woods-Reese, and brothers Brandon and Rodney Green.  I R.T. at 32, 3 R.T. 447.  They would all "hang out in front of [Basped and Lomano's] apartment because there was a bench directly below… [the] apartment window."  Id.  The Green brothers claimed to be members of the Bloods gang.  I R.T. 135.

   B. *The Confrontations.*

   In late July or early August 2007, petitioner had a confrontation with Mr. Boatman over lyrics to a song that mentioned a blue bandana.  II R.T. 399-402.  In this fight, petitioner sucker punched Boatman from behind.  "The next day or a couple of days later, there was a second altercation between Boatman and [petitioner] at the apartment complex in which Boatman hit [petitioner] in the face after [petitioner] refused to apologize for hitting him in the first incident."  ECF No. 14, Attachment 1, at 4.  The second fight prompted Mr. Boatman's girlfriend, Mrs. Basped, to confront petitioner because she did not want to get kicked out of her apartment due to

---

[1] "R.T." refers to the reporter's transcripts lodged in the present case by respondent.

2

the fighting. I R.T. 37-38. Petitioner was "really agitated" and told her that he was a Blood and that "he has no Crips up in the apartments," but she was lucky because he gave Boatman a pass to stay at the complex. I R.T. 37-39. Petitioner then told Mrs. Basped that he "can have the little homies come kick down" her door. I. R.T. 40. This threat prompted Mrs. Basped to seek assistance at the apartment manager's office, where petitioner followed her. I R.T. 41. Once in the manager's office, petitioner "started just going off about how this is his hood, this is where he lives, [and] he's lived here the longest." I. R.T. 41. After this verbal altercation with petitioner, Mrs. Basped returned to her apartment and told Mr. Boatman to lock all the doors and windows and to put the couch up against the door if anyone "comes back to the door again." I. R.T. 42.

   *C. The Shooting.*

These gang-based tensions reached the boiling point on a hot August night in 2007. I R.T. 59, 302. That night, Mr. Lomano, Mr. Woods-Reese, and the Green brothers were hanging out, drinking, and smoking next to the apartment building stairs when petitioner approached them and told them that they had to leave. I. R.T. at 130. Mr. Lomano retorted that "he didn't have to go nowhere. He's waiting for his cousin to come out." I R.T. at 131. During this verbal altercation, petitioner was using the word "Blood" and Mr. Lomano was using the word "Cuz" as a way of disrespecting each other's gang. I. R.T. at 132, 2 R.T. at 494-96. Petitioner eventually left the stairwell. Mr. Lomano, the Green brothers, and Mr. Woods-Reese moved to a different spot in the apartment complex.

Minutes later, petitioner approached the group of men again, but this time he was "side by side" another man wearing a hooded sweatshirt with "the zipper all the way up, so that the jacket was covering most of his face, and he had his hair in dreadlocks covering his eyes." ECF No. 14, Attachment 1, at 5; see I R.T. 139, 203, 269. Petitioner then said something "like 'I thought I told you to move,' or 'what you still doing here?'" I R.T. 143. The man in the hooded sweatshirt then angrily told the group of men that "you all… got to leave now Blood." I R.T. 273; II R.T. 310. Mr. Lomano lit a marijuana cigar and told petitioner and the man in the hooded sweatshirt that "It's a free country." I R.T. 145. The man in the hooded sweatshirt then shot Mr. Lomano and fired several more times on the other men who ran in different directions. As many as five

3

gunshots were heard by the group of men as well as individuals near the apartment complex, including one police officer.  I R.T. 47, 275; II R.T. 374.  Mr. Lomano died of a single gunshot wound to his left shoulder and Mr. Woods-Reese was shot in the shoulder but survived his injuries.

Petitioner was observed by two separate witnesses fleeing the shooting scene with the triggerman.  See I R.T. 96-97; 3 R.T. 576 (stipulated testimony of Monay McKinnie).  Within an hour of the shooting, petitioner called another resident of the apartment complex known as "Old Gangster" or "O.G." to find out if the police had responded to the scene.  II R.T. 445, 448.  When O.G. asked petitioner if he had done something, petitioner just hung up the phone.  II R.T. 451.  Petitioner turned himself into police several weeks later.  The jury also heard several recorded telephone calls that petitioner made from the jail while awaiting trial in which he used the word "Blood" hundreds of times.  See C.T. 234-277[2], III R.T. 608-09.

At trial petitioner admitted to confronting Mr. Boatman on two occasions prior to the shooting, but denied that either of these were gang-related.  III R.T. 623-25.  He also denied being a member of the Bloods.  III R.T. 608.  Petitioner further testified that the man wearing the hooded sweatshirt was a drug dealer from the apartment complex known only as "Juice."  II R.T. 589, III R.T. 605.  Petitioner denied walking next to Juice immediately before the shooting or fleeing with him after the shooting occurred.  III R.T. 603-08, 613.

The jury convicted petitioner as charged and found all the gang and gun sentencing enhancements to be true.  C.T. 178-181.

II.     STANDARDS GOVERNING HABEAS RELIEF UNDER THE AEDPA

28 U.S.C. § 2254, as amended by the AEDPA, provides in relevant part as follows:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as

---

[2] "C.T." refers to the clerk's transcript lodged in the present case by respondent.

4

determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Section 2254(d) constitutes a "constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus." Williams v. Taylor, 529 U.S. 362, 412 (2000). It does not, however, "imply abandonment or abdication of judicial review," or "by definition preclude relief." Miller-El v. Cockrell, 537 U.S. 322, 340 (2003). If either prong (d)(1) or (d)(2) is satisfied, the federal court may grant relief based on a de novo finding of constitutional error. See Frantz v. Hazey, 533 F.3d 724, 736 (9th Cir. 2008) (en banc).

A state court decision is "contrary to" clearly established federal law if the decision "contradicts the governing law set forth in [the Supreme Court's] cases." Williams, 529 U.S. at 405. A state court decision "unreasonably applies" federal law "if the state court identifies the correct rule from [the Supreme Court's] cases but unreasonably applies it to the facts of the particular state prisoner's case." Id. at 407–08. It is not enough that the state court was incorrect in the view of the federal habeas court; the state court decision must be objectively unreasonable. Wiggins v. Smith, 539 U.S. 510, 520–21 (2003). The "unreasonable application" clause permits habeas relief based on the application of a governing principle to a set of facts different from those of the case in which the principle was announced. Lockyer, 538 U.S. at 76. The AEDPA does not require a nearly identical fact pattern before a legal rule must be applied. Panetti v. Quarterman, 551 U.S. 930, 953 (2007). Even a general standard may be applied in an unreasonable manner. Id. In such cases, AEDPA deference does not apply to the federal court's adjudication of the claim. Id. at 948.

The phrase "clearly established Federal law" in § 2254(d)(1) refers to the "governing legal principle or principles" previously articulated by the Supreme Court. Lockyer v. Andrade, 538 U.S. 63, 71–72 (2003). Clearly established federal law also includes "the legal principles and standards flowing from precedent." Bradley v. Duncan, 315 F.3d 1091, 1101 (9th Cir.2002) (quoting Taylor v. Withrow, 288 F.3d 846, 852 (6th Cir.2002)). Only Supreme Court precedent may constitute "clearly established Federal law," but circuit law has persuasive value regarding

what law is "clearly established" and what constitutes "unreasonable application" of that law. Duhaime v. Ducharme, 200 F.3d 597, 600 (9th Cir.2000).

Relief is also available under the AEDPA where the state court predicates its adjudication of a claim on an unreasonable factual determination. 28 U.S.C. § 2254(d)(2). The statute explicitly limits this inquiry to the evidence that was before the state court. Even factual determinations that are generally accorded heightened deference, such as credibility findings, are subject to scrutiny for objective reasonableness under § 2254(d)(2). See e.g., Miller–El v. Dretke, 545 U.S. 231, 240 (2005).

To prevail, a habeas petitioner must establish the applicability of one of the § 2254(d) exceptions and also must also affirmatively establish the constitutional invalidity of his custody under pre-AEDPA standards. Frantz, 533 F.3d 724. There is no single prescribed order in which these two inquiries must be conducted. Id. at 736-37. The AEDPA does not require the federal habeas court to adopt any one methodology. Lockyer v. Andrade, 538 U.S. 63, 71 (2003).

III.   THE STATE COURT ADJUDICATION OF PETITIONER'S CLAIMS

Following affirmance of his convictions by the California Supreme Court, petitioner filed the instant federal action challenging the sufficiency of the evidence and the effectiveness of his trial attorney. Both of these claims were raised and rejected on the merits in petitioner's direct appeal. The California Court of Appeal decision, ECF No. 14, Attachment 1, constitutes the last reasoned decision on the merits of these claims because the state supreme court denied discretionary review. See Ylst v. Nunnemaker, 501 U.S. 797 (1991). Since the state courts denied relief in a reasoned opinion, review under § 2254(d) is confined to "the state court's actual reasoning" and "actual analysis." Frantz, 533 F.3d at 738.

IV.   PETITIONER'S CLAIMS FOR RELIEF

   A.   *Sufficiency Challenge.*

Petitioner first alleges that his right to due process was violated because there was insufficient evidence that he aided and abetted the actual triggerman. He argues that he was merely present at the crime scene, did not know that the triggerman was armed, and that there was no evidence that he shared the triggerman's intent to kill the victims that night.

The California Court of Appeal rejected this claim by emphasizing that it "ignores the bulk of the evidence presented at trial and the rational inferences the jury was entitled to draw from that evidence." ECF No. 14, Attachment 1, at 10. The "jury was entitled to conclude that [petitioner] felt he had been disrespected by rival gang members – specifically, both Boatman and Lomano – and that he decided to stop letting Lomaono 'have a pass,' so when Lomano and his friends refused [petitioner's] demand to leave and Lomano used the word 'cuz' in his conversation with [petitioner], [petitioner] went to get a fellow gang member with a gun, knowing that if Lomano and his friends again refused to leave, his companion would shoot them." Id. It then pointed to the evidence demonstrating that the triggerman used the word "Blood" prior to shooting the victims just as petitioner had done in his prior altercation with Mr. Lomano. Id. The state court also rejected petitioner's argument that he lacked the intent to kill two of the attempted murder victims, the Green brothers, because they were fellow Bloods. The California Court of Appeal concluded that "there was evidence [petitioner] did not know the Green brothers were Bloods" as well as other testimony that Bloods fight with Bloods. ECF No. 14, Attachment 1, at 11-12.

The California Court of Appeal's decision is not an unreasonable application of federal law. Due process requires that each essential element of a criminal offense be proven beyond a reasonable doubt. United States v. Winship, 397 U.S. 358, 364 (1970). In reviewing the sufficiency of evidence to support a conviction, the question is "whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, (1974). If the evidence supports conflicting inferences, the reviewing court must presume "that the trier of fact resolved any such conflicts in favor of the prosecution," and the court must "defer to that resolution." Id. at 326

Petitioner characterizes himself as merely present at the scene of the crime. However, as the state court pointed out, that completely ignores the trial evidence demonstrating an ongoing and escalating series of gang-related confrontations between petitioner and the victims prior to the shooting. This was not a case of a simple noise complaint between neighbors. Numerous

witnesses testified to the gang-controlled environment, or the "beehive," in which this crime occurred. Moreover, the jury rejected petitioner's testimony that he was not walking side by side with his hooded cohort, and this credibility determination by the jury is entitled to near total deference on habeas. See Schlup v. Delo, 513 U.S. 298, 330 (1995). Based on the trial evidence, the jury could have found that petitioner instigated this crime by going and getting the hooded man who ended up being the triggerman. The evidence demonstrated that petitioner and the hooded man repeated nearly identical gang threats and both told the victims to leave the area. The hooded cohort did not first ask the group of men to be quiet. Rather he told them that they had to leave. This indicated that the hooded shooter had prior knowledge of petitioner's first confrontation with the group of men where petitioner told them that they had to leave. It further demonstrated that they shared the same purpose of removing Crips from the apartment complex. Since there was no evidence indicating that petitioner knew the Green brothers were Bloods, the jury's verdict is supported by sufficient evidence with respect to the attempted murder counts involving these victims. It simply cannot be said that no rational juror could have found proof of guilt beyond a reasonable doubt. On this record, the state court did not unreasonably apply the Jackson standard.

      *B. Ineffective Assistance of Counsel.*

In Claim Two, petitioner alleges that his counsel was ineffective for failing to object on vagueness grounds to the jury instruction concerning the "kill zone" theory of liability for attempted murder. Petitioner argues that the instruction's use of the terms "zone of harm" and "kill zone" lowered the prosecution's burden of proof by expanding the liability for attempted murder.[3] ECF No. 1 at 14.

---

[3] The jury was instructed as follows: "To prove that the defendant is guilty of attempted murder, the People must prove that: 1. The perpetrator took direct but ineffective steps, that the defendant aided and abetted, toward killing another person; and 2. The defendant intended to kill that person.... A person may intend to kill a specific victim or victims and at the same time intend to kill anyone in a particular zone of harm or 'kill zone.' In order to convict the defendant of the attempted murder of Brandon Green, Rodney Green and Jesse Woods-Reese, the People must prove that the defendant not only intended to kill Sione Lomano but also either intended to kill Brandon Green, Rodney Green and Jesse Woods-Reese or intend to kill anyone in the kill zone. If (continued…)

The state court emphasized that petitioner's "quarrel is not with the terms of the criminal statutes defining attempted murder; rather, it is with that portion of the attempted murder form jury instruction that addresses the concurrent intent theory of attempted murder." ECF No. 14, Attachment 1, at 114-15. It found that the challenged portion of CALCRIM No. 600 "does not constitute a statement of the law, but is instead an explanation of a reasonable inference the jury might draw from the evidence." Id. at 15-16. Because petitioner did "not cite any authority for the proposition that the 'void for vagueness' doctrine applies to jury instructions, let alone to a part of a jury instruction that is not a statement of the law," the California Court of Appeal rejected the argument underlying petitioner's ineffective assistance of counsel claim. Id. at 16.

The state court then applied the correct standard of review and considered the challenged instruction in the context of the jury instructions as a whole. ECF No. 14, Attachment 1, at 16; see also Henderson v. Kibbe, 431 U.S. 145, 152 n. 10 (1977). The California Court of Appeal noted that petitioner did "not suggest there was a reasonable likelihood the jury did not understand the term 'kill zone' in light of the instructions given, the entire record of trial, and the arguments of counsel." Without being able to mount a direct attack on the jury instruction for the reasons articulated by the California Court of Appeal, petitioner instead mounted an indirect attack by challenging his counsel's effectiveness for failing to argue against the giving of the instruction. The state court denied relief on the ineffective assistance of counsel claim after rejecting petitioner's argument that there was no tactical reason for failing to object to the instruction. ECF No. 14, Attachment 1, at 16-17. Even assuming deficient performance by counsel, the state court denied relief finding that there was no "reasonable probability that he would have achieved a better result if his attorney had done so." ECF No. 14, Attachment 1, at 17.

////

---

you have reasonable doubt whether the defendant intended to kill Brandon Green, Rodney Green, and Jesse Woods-Reese or intended to kill Sione Lomano by harming everyone in the kill zone, then you must find the defendant not guilty of the attempted murder of Brandon Green, Rodney Green and Jesse Woods-Reese." C.T. 150.

1    To establish a constitutional violation based on ineffective assistance of counsel, a
2 petitioner must show (1) that counsel's representation fell below an objective standard of
3 reasonableness, and (2) that counsel's deficient performance prejudiced the defense. Strickland v.
4 Washington, 466 U.S. 668, 692, 694 (1984). Prejudice means that the error actually had an
5 adverse effect on the defense. There must be a reasonable probability that, but for counsel's
6 errors, the result of the proceeding would have been different. Id. at 693–94. The court need not
7 address both prongs of the Strickland test if the petitioner's showing is insufficient as to one
8 prong. Id. at 697. "If it is easier to dispose of an ineffectiveness claim on the ground of lack of
9 sufficient prejudice, which we expect will often be so, that course should be followed." Id.

10   Here, the state court did not unreasonably apply the Strickland standard. The California
11 Court of Appeal's conclusion that any challenge to the instruction would not have changed the
12 outcome of petitioner's trial is not objectively unreasonable in light of the gang evidence at trial
13 which petitioner completely ignores in his briefs before this court. The gang evidence
14 demonstrated that petitioner and the triggerman shared the intent to rid the apartment complex of
15 Crips. Petitioner's attempt to narrow his intent to only one particular member of the Crips gang,
16 namely Mr. Lomano, is unavailing because it did not preclude him from having the concurrent
17 intent to kill other threats to his gang of Bloods.

18   Petitioner's prejudice argument seems to be centered on the type of weapon used in the
19 instant offense, which was a revolver and not an automatic weapon. While People v. Bland, 28
20 Cal.4th 313 (2002), the California case which created the "kill zone" theory of liability, used an
21 automatic weapon and an explosive device as examples that would support this theory of criminal
22 liability, those weapons certainly are not the only devices that would warrant the use of this
23 instruction. In fact, Bland referred to firing a "flurry of bullets." 28 Cal.4th at 330-331. That is
24 exactly what occurred in the present case. The type of weapon they were fired from simply is not
25 dispositive.

26   For all these reasons, it is not reasonably likely (1) that an objection to the jury instruction
27 would have been successful, or (2) that the jury would have returned a different verdict even
28 without the instruction. Accordingly, the state court's adjudication of the Strickland claim was

10

not objectively unreasonable and habeas relief is not warranted on this claim.

Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within twenty one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." If petitioner files objections, he shall also address whether a certificate of appealability should issue and, if so, why and as to which issues. A certificate of appealability may issue under 28 U.S.C. § 2253 "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(3). Any response to the objections shall be served and filed within fourteen days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

DATED: October 28, 2013

_/s/ Allison Claire_
ALLISON CLAIRE
UNITED STATES MAGISTRATE JUDGE

AC:ts/Stew2348.157.kjn